Sidney HERTZ, Appellant,

v.

STATE of Alaska, DEPARTMENT OF CORRECTIONS, Appellee.[1]

No. S–12842.

Supreme Court of Alaska.

Jan. 8, 2010.

Rehearing Denied May 17, 2010.

---

1. Hertz filed this case under the caption of the 1981 class action *Cleary et al. v. Smith et al.* Because he is not authorized to represent the class (*see infra* Part IV.A), we have re-named this case. *See Hertz v. State, Dep't. of Corr.,* 869 P.2d 154 (Alaska 1994).

Sidney R. Hertz, pro se, Seward.

John K. Bodick, Assistant Attorney General, Anchorage, and Talis J. Colberg, Attorney General, Juneau for Appellees.

Before MATTHEWS, EASTAUGH, CARPENETI, and WINFREE, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

A pro se prisoner moved for an injunction against the Alaska Department of Corrections ordering the department to pay "gate money" to all prisoners upon release as provided for in the 1990 Final Settlement Agreement (FSA) in the *Cleary* case, a class action by inmates regarding prison conditions. After passage of the Alaska Prison Litigation Reform Act (APLRA) in 1999, the department stopped issuing gate money. The inmate argues that the department is still bound by the FSA's gate money provisions regardless of APLRA. The inmate also re-

quested court-appointed counsel in order to represent the *Cleary* class.

The superior court denied the inmate's motion for reinstatement of gate money, and failed to respond to the inmate's request for counsel. Because APLRA bars the inmate's claim for reinstatement of gate money, and because any error in the court's failure to rule on the motion for appointed counsel was harmless since the law clearly does not entitle the inmate to counsel, we affirm the decision of the superior court.

## II. FACTS AND PROCEEDINGS

Prisoner Sidney Hertz has previously come before this court regarding the FSA.[2] *Hertz v. Cleary*[3] gives a helpful description of the *Cleary* settlement:

The Cleary litigation began in 1981 as a Civil Rule 23 class action challenging the conditions of Alaska's correctional facilities.... In January 1983, the superior court approved the parties' partial settlement agreement....

In December 1987, the superior court appointed a standing compliance monitor to oversee compliance with the partial settlement agreement. Various issues concerning compliance with and interpretation of the partial settlement agreement were litigated in the superior court through 1989, when efforts at settlement were renewed. On August 1, 1990, the negotiation efforts of the parties and the standing compliance monitor culminated in the proposed Final Settlement Agreement (FSA).

The proposed FSA and an analysis of the settlement by the attorney representing the class were distributed to all class members.... [It] was amended to address comments from class members, including comments from Sidney Hertz.... In its approval of the FSA the superior court ... held that the provisions of the FSA were reasonable and in the best interests of the class.[4]

The FSA sets out comprehensive and detailed standards for correctional facilities and procedures, including a provision that "gate money"[5] be paid to prisoners at their release.[6] The FSA required the department to implement a program to provide "inmates convicted of felonies who have been released from facilities after serving a sentence and who have not been eligible for Permanent Fund Dividends, or who have not been able to retain at least $150 of Permanent Fund Dividends because of mandatory deductions, with at least $150 of gate money...."

In 1999, nine years after the FSA, the legislature passed the Alaska Prison Litigation Reform Act (APLRA).[7] APLRA limits the situations in which prisoners may seek prospective relief in lawsuits challenging prison conditions.[8] Section (a) provides: "a court may not order prospective relief in a civil action with respect to correctional facility conditions unless the court finds that [ ] the plaintiff has proven a violation of a state or federal right...."[9] It also provides that "prospective relief ordered under a consent decree ... shall be terminated upon the motion of the [department] unless the court finds that there exists a current violation of a state or federal right and makes the findings required by (a)...."[10]

Following passage of APLRA, the department brought a motion in superior court to

---

2. *See Hertz v. Cleary*, 835 P.2d 438 (Alaska 1992); *Hertz v. State, Dep't of Corr.*, 869 P.2d 154 (Alaska 1994).

3. *Hertz*, 835 P.2d 438.

4. *Id.* at 439–40.

5. Gate money refers to "discharge payments [provided] to prisoners upon their release. This 'gate money' was part of the financial assistance package intended to help prisoners re-establish themselves in the community." *Baker v. State*, 158 P.3d 836, 838 (Alaska App.2007).

6. The specific "gate money" provision takes up one paragraph in the eighty-eight page settlement agreement (Rec. 006617–006707. Gate money provision Rec. 006668).

7. AS 09.19.200.

8. *Id.*

9. AS 09.19.200(a).

10. AS 09.19.200(c).

terminate the FSA consent decrees.[11] The *Cleary* prisoner class opposed the department's motion on the grounds that APLRA was unconstitutional.[12] The superior court upheld the statute, but also held that it did not terminate the FSA consent decrees.[13] The court found that APLRA merely terminated prospective relief, and thus was constitutional.[14] The *Cleary* class, of which Hertz was a member, did not appeal that superior court decision.

Shortly thereafter, Department of Corrections Commissioner Marc Antrim issued a memorandum terminating the payment of gate money:

> Effective October 1, 2003, the Alaska Department of Corrections will no longer issue "gate money" to felons at the time of their release. While gate money was initiated under the *Cleary, et al.* Final Settlement Agreement, the Department is no longer required to make the payments. Payments of gate money were specifically prohibited under 22 AAC 05.590 *Discharge Payments*, originally made effective in 1977 and amended in 1987, which provides: "Upon release of a prisoner, the department will not provide a discharge payment or gate money to the prisoner. Each prisoner is entitled to receive any work program compensation and prisoner fund account money due, by check or cash, at the time of release."

In January 2007 Hertz filed a "Complaint for Declaratory Judgment and Injunctive Relief For Non-compliance with the Consent Decree." Hertz alleged several violations of the FSA. He sought, among other things, a judgment declaring the department in violation of the FSA for discontinuing gate money, and an injunction requiring the department to reinstate gate money for all prisoners, as provided by the FSA. Hertz purported to act for the class and filed under the original *Cleary v. Smith* caption. But the FSA provides that an inmate cannot represent the class without an attorney or permission from the court to proceed pro se.[15] Although Hertz never requested permission to proceed pro se, in April 2007 he moved the superior court to appoint an attorney for him. Hertz later wrote to the clerk of court requesting a ruling. The superior court never ruled on his motion for court-appointed counsel.

In May 2007 the Department responded to Hertz's FSA motion, arguing that APLRA barred his claim for gate money because he failed to show the Department had violated a state or federal right. The superior court denied Hertz's motion, holding that "Hertz has ... failed to state a state or federal right to gate money as required by [APLRA]." Hertz moved for reconsideration, which the court denied. Hertz now appeals that denial and the court's failure to appoint counsel.

## III. STANDARD OF REVIEW

In cases involving statutory interpretation, we review appeals using our independent judgment.[16] Under that standard, we will "adopt[ ] the rule of law that is most persuasive in light of precedent, reason, and policy." [17] When previously examining the FSA, we found that the FSA's "scope and effect raise questions of contract law that

---

11. *Cleary v. Smith*, No. 3AN–81–5274 Ci. (Alaska Super. July 3, 2001).

12. *Id.*

13. *Id.*

14. *Id.* ("This court ... finds that the APLRA should be construed narrowly to affect only the prospective relief due parties under the consent decree and not the consent decree itself.... [T]his court believes it would pose a grave constitutional question if the Alaska Legislature was attempting to require the court to terminate a final order and judgment rather than merely terminate the relief available under the consent decree. As the more difficult question of constitutionality can be avoided by construing the APLRA narrowly to terminate only prospective relief due parties under the consent decree but not the consent decree itself, and as this is a reasonable interpretation of the statute, the court adopts this interpretation.").

15. *Hertz v. State, Dep't. of Corr.*, 869 P.2d 154, 155 (Alaska 1994).

16. *W. Star Trucks, Inc. v. Big Iron Equip. Serv., Inc.*, 101 P.3d 1047, 1048 (Alaska 2004).

17. *Id.*

[we] review de novo." [18]

## IV. DISCUSSION

### A. Hertz Does Not Represent the *Cleary* Class.

■ As a preliminary matter, we note that although Hertz filed under the original *Cleary* caption with the intent of representing the class, he does not represent the class. Despite the fact that this case has come to us under the original *Cleary* heading, the superior court never gave Hertz permission to represent the class.

### B. The Superior Court Did Not Err in Denying Hertz's Motion for Declaratory and Injunctive Relief Because APLRA Applies, Hertz Failed To Prove Violation of a Federal or State Right, and His Claim Does Not Qualify for an Exception.

Hertz's claim for gate money fails because he demands prospective relief, he does not allege violation of a state or federal right, and he demands relief of indefinite duration. APLRA declares that "a court may not order prospective relief in a civil action with respect to correctional facility conditions unless the court finds that [ ] the plaintiff has proven a violation of a state or federal right...." [19] To the extent that Hertz de-

mands relief based on ongoing enforcement of the FSA, part (c) of APLRA provides that a court shall terminate prospective relief ordered under a consent decree upon motion of the department unless the court finds a current violation of a state or federal right.[20] The department properly made that motion in August 2000.

The issue then is whether the department's discontinuance of gate money violates a state or federal right. Hertz argues that the FSA is a contract and that he "has a contractual right to gate money." [21] The department argues that Hertz has no state or federal right to gate money on the grounds that no statute exists creating such a right. Both contracts and statutes can create property rights protected by the Alaska and United States constitutions.[22] We agree with the department that Hertz has no statute-based property right in gate money. As for Hertz's contract-based claim, we conclude that the FSA's language does not create a property right to prospective enforcement of the gate money provision.

### 1. APLRA applies because Hertz demands prospective relief, and to the extent the claim is based on the FSA, the department has properly moved for termination.

■ APLRA defines "prospective relief" as "all relief other than compensatory mone-

---

18. *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001).

19. AS 09.19.200(a). Neither party discusses whether "gate money" is in "respect to a correctional facility condition." Therefore, we assume that gate money concerns a "correctional facility condition" without deciding the issue.

20. AS 09.19.200(c).

21. Hertz does not appear to challenge the underlying constitutionality of APLRA. Although his reply brief recites the Contracts Clauses of both the Alaska and United States Constitutions as in support of his argument, he does not argue the point. Furthermore, in his opening brief, Hertz concedes that "APLRA does not violate the Contract Clause of the United States or Alaska Constitutions." Were Hertz to argue that the APLRA is unconstitutional, the doctrine of *res judicata* would probably bar that argument. Hertz was a member of the *Cleary* class when it challenged the APLRA's constitutionality in supe-

rior court. *Cleary et al. v. Smith et al.*, No. 3AN–81–5274 Ci. (Alaska Super. July 3, 2001). The superior court addressed the Contracts Clauses of both the Alaska and Federal Constitutions. It upheld the statute's limits on prospective relief as constitutional, and the *Cleary* class did not appeal that decision. Therefore we do not consider the constitutionality of APLRA here. But the *Cleary* class did not litigate whether APLRA applies to claims for gate money. Thus, the *Cleary* class did not raise the claims Hertz raises here, and *res judicata* does not bar those claims. *See Ferguson v. State*, 816 P.2d 134 (Alaska 1991) (holding inmate's challenge to drug testing procedures not barred by *res judicata* based on previous *Cleary* litigation).

22. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Breeden v. City of Nome*, 628 P.2d 924, 926 (Alaska 1981) (discussing statute governing terms of employment with city as well as employee's contract with city in order to determine whether employee had protected property interest in employment).

tary damages." [23] Hertz demands declaratory and injunctive relief, which fall squarely into this definition. If the superior court had granted his motion, he would not have gotten a compensatory monetary award, but rather a court order directing the department to take future action. Hertz remains a prisoner, so any payment of gate money to him would have to come in the future. Hertz himself characterizes his complaint as being for "declaratory judgment and injunctive relief." Therefore, we conclude that Hertz requests prospective relief within the meaning of APLRA. [24]

Insofar as Hertz demands continued prospective enforcement of the FSA, the superior court effectively terminated prospective enforcement on the department's motion in 2001. APLRA provides that the department may move to terminate prospective relief ordered under a consent decree. [25] The department made that motion in August 2000. The superior court granted the motion and upheld the constitutionality of APLRA. The superior court order specifically required that all future claims for prospective relief under the FSA must show a current violation of a state or federal right, as required by APLRA. The *Cleary* class, of which Hertz was a member, did not appeal that order. In addition to the department's 2000 motion, then-Commissioner Antrim issued a memorandum declaring that the department would resume enforcement of 22 AAC 05.590, which declares that the department will not issue gate money.

APLRA applies to Hertz's claim for prospective relief.

**2. Hertz has no state or federal right to gate money arising either from statute or from contract.**

 Having concluded that APLRA applies, we next consider whether Hertz has shown a violation of a state or federal right as APLRA requires for prospective relief. APLRA defines a state or federal right as "arising from the United States Constitution, the Constitution of the State of Alaska, or a federal or state statute." [26] We read Hertz's statements that he has a "contractual right" to gate money as alleging that the FSA gives him a protected property interest in gate money, or in an injunction requiring the Department to issue gate money. Both the United States and Alaska Constitutions protect property rights. The Supreme Court held in *Board of Regents of State Colleges v. Roth* that "[p]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." [27] Alaska has adopted this same "claims of entitlement" test for property rights protected by the Alaska Constitution. [28] Under this test, property rights can arise from both statutes and contracts. [29]

**a. Hertz has no statute-based right to gate money.**

The department correctly points out that no state or federal statute provides for gate money. In fact, a state regulation specifically declares that Alaska does not provide gate money. [30] Furthermore, federal courts have

---

**23.** AS 09.19.200(g)(5).

**24.** We note that his claim for prospective relief raises different issues than would a claim for breach of contract by a released prisoner who had been denied gate money. That question is not presented here, and we do not address it.

**25.** AS 09.19.200(c).

**26.** AS 09.19.200(g)(7).

**27.** 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**28.** *Breeden v. City of Nome*, 628 P.2d 924, 926 (Alaska 1981) (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. 2701).

**29.** *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976) ("A property interest . . . can, of course, be created by ordinance, or by . . . contract."); *Breeden*, 628 P.2d at 926.

**30.** *See Baker v. State*, 158 P.3d 836, 838 (Alaska App.2007); *see also* 22 AAC 05.590 ("Upon release of a prisoner, the department will not provide a discharge payment or gate money to the prisoner.").

consistently declined to hold that statutes create a federally protected property right in gate money.[31] Therefore, Hertz has no "claim of entitlement" to gate money arising under state or federal statutes.

### b. Hertz has no contract-based right to gate money.

Hertz's main argument is that he has a property right to gate money arising from the FSA under a contract analysis. Like a statute, a contract can also create property rights by giving rise to a "claim of entitlement."[32] The department does not address this argument. We conclude after a careful examination of its language that the FSA does not create a continuing claim of entitlement to gate money because it grants broad discretion to the trial court to terminate or modify its terms in response to changes in law and circumstances.

■■■■■ We construe consent decrees following normal principles of contract interpretation:[33]

> The goal of the court is to enforce the reasonable expectations of the parties. In determining the intent of the parties, the court looks to the written contract as well as extrinsic evidence regarding the parties' intent at the time the contract was made. The parties' expectations are assessed by examining the language used in the contract, case law interpreting similar language, and relevant extrinsic evidence, including the subsequent conduct of the parties.[34]

The FSA provides: "The parties agree that future questions regarding the implementation and enforcement of this agreement shall be interpreted in a manner that gives meaning to the intent expressed by the parties with consideration for changes to Alaska's adult correctional facilities that may exist at the time." Thus, we turn to the FSA itself to determine whether the parties intended to create an indefinite entitlement to gate money for class members.

The FSA is a comprehensive document, eighty-eight pages in length, giving detailed provisions for all aspects of prison life including facilities conditions and overcrowding, operations, rights and opportunities for inmates, rehabilitation programs, discipline, and grievances. The gate money provision at issue here is a short paragraph on page forty-nine. Pages seventy-eight through eighty-four deal with "future monitoring, modification and enforcement" of the agreement. Although the gate money provision is written in absolute terms ("the Department shall . . ."), the seven-page section on monitoring, modification, and enforcement gives broad discretion to the trial court to modify the agreement in the event of changed law or circumstances.

The FSA specifically provides that in the event of a "clear showing of material changes in circumstance or controlling law," either party may move for relief from the FSA decree, and that "all or some provisions of [the FSA may] be vacated and/or modified accordingly." The FSA further provides that such an application for relief or modification "shall be governed by the principles of Civil Rule 60(b)(5) and (6)." Alaska Civil Rules 60(b)(5) and (6) give discretion to the trial court. Civil Rule 60(b)(5) allows a trial court to grant relief from judgment when, among other things, "it is no longer equitable

**31.** *See Webster v. Chevalier*, 834 F.Supp. 628 (W.D.N.Y.1993) (holding that New York did not violate inmate's due process rights by changing release policy from a "gift" of gate money from state funds to taking gate money out of inmate's wages); *Ward v. Stewart*, 511 F.Supp.2d 981, 985 (D.Ariz.2007) (Arizona did not commit an unconstitutional taking by withholding gate money from wages of inmate who faced life imprisonment and would therefore never see gate money because even if gate money is considered private property, "prisoners forfeited all right to possess, control, or dispose of private property.").

**32.** *Bishop*, 426 U.S. at 344, 96 S.Ct. 2074.

**33.** *Smith v. Cleary*, 24 P.3d 1245, 1247 (Alaska 2001) (citing *Hertz v. State, Dep't of Corr.*, 869 P.2d 154 (Alaska 1994) and *Logghe v. Jasmer*, 686 P.2d 694 (Alaska 1984)). *Cf. Rathke v. Corr. Corp. of Am.*, 153 P.3d 303, 311 (Alaska 2007) (relying on *Smith*, 24 P.3d at 1247 n. 3, but stating in dicta that the FSA "is an enforceable contract between Alaska inmates and the state").

**34.** *Id.* at 1249 (quoting *Municipality of Anchorage v. Gentile*, 922 P.2d 248, 255–56 (Alaska 1996)).

that the judgment should have prospective application." Civil Rule 60(b)(6) allows the trial court to grant relief from judgment for "any other reason justifying relief from the operation of the judgment." Such justifying reasons have been found in a variety of situations, including passage of new applicable legislation.[35] By specifically referring to Rule 60(b)(6), the parties to the *Cleary* FSA showed their intent that the trial court be able to modify or terminate enforcement of all or parts of the FSA if governing law changed substantially.

Thus, we conclude that the parties' intent was not to guarantee that all provisions of the FSA would continue indefinitely. Rather, the parties intended that trial court enforcement of the FSA would be flexible and responsive to future changes in law and circumstances. Hertz had no legitimate expectation that the court would never change or discontinue enforcement of the consent decree.

Furthermore, Hertz has no right to an injunction. Federal courts have consistently refused to find a property right in prospective enforcement of a consent decree. Like the Alaska Prison Litigation Reform Act, the Federal Prison Litigation Reform Act (PLRA) makes prospective relief terminable unless the court makes written findings that "prospective relief [is] necessary to correct a current and ongoing violation of [a] Federal right."[36] After passage of PLRA, several federal courts addressed whether PLRA violated due process by taking protected property rights when terminating prospective enforcement of consent decrees. These courts

consistently held that inmates have no protected property rights in injunctions enforcing consent decrees.[37]

To the extent that Hertz asserts that he has a contractual right to an injunction against the department, the same logic applies. Because the consent decree may be modified or terminated by the issuing court, a party never acquires a protected property right to a continuing injunction.[38]

### 3. Hertz's claim does not qualify for an APLRA exception

Hertz contends that APLRA's subsection .200(e), which grants courts the ability to grant prospective relief for certain aspects of consent decrees, should apply to the gate money provision of the FSA.

Subsection .200(e) reads: "Notwithstanding (a) of this section, in a civil action with respect to correctional facility conditions,[39] a court may order prospective relief as provided in a consent decree without complying with (a) of this section, provided the prospective relief does not continue for a period of more than two years unless the court finds and orders that the continuation of the relief is appropriate under the standards in (c) of this section." Subsection .200(c), discussed above, bars prospective relief unless the court finds violation of a state or federal right. Part (c), also discussed above, makes prospective enforcement of consent decrees terminable unless the court makes the same finding.

---

**35.** *See McGee v. McGee*, 974 P.2d 983, 989–991 (Alaska 1999) (finding no error where trial court granted relief under Civil Rule 60(b)(6) from marital property division judgment after creation of Individual Fishing Quota program which created valuable marital property not divided in original judgment); *Weiss v. State*, 939 P.2d 380, 397 (Alaska 1997) (discussing consent decree in class action against state by developmentally disabled plaintiffs, we noted that "[a] material change of the settlement agreement by the legislature would ... present one of the narrowly defined situations that clearly present 'other reason[s] for justifying relief' under Rule 60(b)(6)" allowing a court to relieve plaintiffs of their own obligations under the agreement).

**36.** 18 U.S.C. § 3626(b) (2006).

**37.** *See, e.g., Benjamin v. Jacobson*, 172 F.3d 144, 164 (2nd Cir.1999) (finding no protected property right in prospective enforcement of consent decree, and therefore that PLRA does not violate due process by depriving inmates of it); *see also Inmates of Suffolk County Jail v. Rouse*, 129 F.3d 649, 658 (1st Cir.1997); and *Plyler v. Moore*, 100 F.3d 365, 370 (4th Cir.1996) ("[W]e conclude that the term "Federal right" as used in [PLRA] does not include rights conferred by consent decrees providing relief greater than that required by federal law.").

**38.** *Benjamin*, 172 F.3d at 164.

**39.** *See supra* n. 19.

Under subsection .200(e) the court could require the department to abide by terms of the FSA for up to two years without finding violation of a state or federal right.[40] But Hertz does not ask for reinstatement of gate money for only two years. Because Hertz seeks an injunction lasting longer than two years, this exception cannot apply to his claim.

Furthermore, this subsection permits the court to enforce consent decrees, but does not mandate it: "the court *may* order prospective relief...."[41] Even if Hertz's claim met the two-year limit, the superior court would still have had discretion to deny it.

## C. Any Error in the Superior Court's Failure To Rule on Hertz's Motion for Appointment of Counsel Was Harmless.

 Hertz filed his motion for appointment of counsel on April 8, 2007. He explains that he filed the motion because, as we stated in *Hertz v. Cleary*, Hertz may not represent the class pro se without court permission.[42] The court did not rule on this motion. Hertz followed up with a letter to the court on June 24, 2007. Hertz wrote: "I am requesting some kind of ruling either granting or denying my motions so we can move these problems along."

The department contends that Hertz failed to preserve this argument because he did nothing more to demand a ruling from the superior court. The department cites to *Millette v. Millette* for the proposition that litigants, even pro se litigants, waive appeals of motions if they fail to take action to obtain a ruling from the trial court.[43]

In *Millette*, as in this case, the litigant sent a written request to the court after the court did not rule on a motion.[44] The litigant then participated in a custody hearing before the court, but failed to raise the issue of the motion until four days into the hearing.[45] We held that because he did not raise the court's failure to rule until well into the hearing, the litigant did not take sufficient action to bring the motion to the court's attention, and therefore waived the issue.[46]

*Millette*, however, is inapposite. Unlike *Millette*, where the litigant had the attention of the court during his custody hearing, Hertz took the only action that a pro se prisoner, without a court hearing, could take: He wrote a letter alerting the court of his pending motion. His case did not come before the court in a hearing. Hertz therefore did take sufficient action to notify the court of his pending motion.

Even though Hertz did not waive this issue, he is not entitled to the relief he seeks, namely a remand "back to the trial court with directions to appoint either an attorney to represent the class or as an alternative [appointment of] a Court monitor to review Hertz's assertions of non-compliance" with the FSA. Because the law does not entitle Hertz to court-appointed counsel, any error by the lower court in failing to rule on this motion was harmless.

 Any right to appointed counsel for an indigent plaintiff must come from a statute, a rule, or the constitution.[47] No Alaska statute or rule gives Hertz the right to appointed counsel in this situation,[48] nor does the Alaska Constitution.[49] Finally, Hertz does not have a due process right to counsel. We use the federal balancing test from

40. AS 09.19.200(e).

41. AS 09.19.200(e) (emphasis added).

42. 835 P.2d 438, 442 n. 3 (Alaska 1992).

43. 177 P.3d 258, 268 (Alaska 2008).

44. *Id.*

45. *Id.*

46. *Id.*

47. *See* Alaska R. Admin. P. 12(a) ("The court shall appoint counsel .... only when the court specifically determines that the appointment is clearly authorized by law or rule").

48. *See* Alaska R. of Admin. P. 12(b)-(c) (giving appointments procedures under those statutes providing for appointment of counsel—AS 18.85.100 and AS 44.12.410).

49. *See* Alaska R. of Admin. P. 12(e) (setting out appointments procedures in situations where constitution or statutes require appointment of counsel—for biological parents in adoption cases governed by the Indian Child Welfare Act, for minor children and indigent parents/custodians in minor guardianship cases, for respondents in

*Mathews v. Eldridge*[, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (19760)] to determine when a plaintiff's due process rights are violated by failure to appoint counsel.[50] We consider and balance three factors:

> [T]he private interest affected by the official action; the risk of an erroneous deprivation of such interest through the procedures used and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the fiscal and administrative burdens that additional or substitute procedural requirements would entail.[51]

Property rights, particularly purely monetary interests, are not particularly compelling private interests under this test.[52] Furthermore, although Hertz might have had a better chance of succeeding with a lawyer, the state has strong interests in avoiding the high fiscal and administrative burdens of providing counsel to every inmate wishing to represent the *Cleary* class.[53] The balance of interests under *Mathews v. Eldridge* indicates that due process did not require Hertz to have appointed counsel.

## V. CONCLUSION

Because the Alaska Prison Litigation Reform Act applies to and bars Hertz's request for prospective relief, and because the failure to rule on Hertz's motion for appointment of counsel was at most harmless error because the law in that area does not entitle Hertz to appointed counsel, the decision of the superior court is AFFIRMED.

FABE, Chief Justice, not participating.

---

protective proceedings governed by AS 13.26, for minor children or incompetents who are heirs or devisees of estates which cannot pay their attorney's fees, for indigent putative fathers when the state of Alaska provides representation for mothers, for indigent respondents in involuntary alcohol commitments governed by AS 47.37, and for indigent parents defending a claim that their consent to adoption is not required).

**50.** *Bustamante v. Alaska Workers' Comp. Bd.,* 59 P.3d 270, 274 (Alaska 2002) ("[Plaintiff's] claim does not fall into one of the already recognized

exceptions [to the rule that an indigent person has no right to appointed counsel in most civil cases]. We must therefore determine whether [Plaintiff's] due process rights were violated. . . .").

**51.** *Id.*

**52.** *Midgett v. Cook Inlet Pre–Trial Facility,* 53 P.3d 1105, 1112 (Alaska 2002).

**53.** *See Bustamante,* 59 P.3d at 274.